FILED
2020 Jun-01  AM 10:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JENNIFER WHITWORTH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:** |
| | ) | _____ |
| **STEVEN MEZRANO and** | ) | |
| **MEZRANO LAW FIRM, P.C.,** | ) | |
| | ) | |
| **Defendants.** | ) | **PLAINTIFF DEMANDS TRIAL** |
| | ) | **BY STRUCK JURY** |

---

## COMPLAINT

---

## INTRODUCTION

Plaintiff Jennifer Whitworth ("Ms. Whitworth") brings this action for legal and equitable relief to redress the unlawful employment practices of Defendant Mezrano Law Firm, P.C. ("Mezrano Law Firm"). Ms. Whitworth was discriminated against and sexually harassed by Steven Mezrano ("Mr. Mezrano") the owner of the Mezrano Law Firm. Mr. Mezrano and the Mezrano Law Firm retaliated against Ms. Whitworth after her complaints of gender discrimination and sexual harassment.

## JURISDICTION AND VENUE

1.     Federal Question Subject Matter Jurisdiction is proper pursuant to 28

1

U.S.C. § 1331. Ms. Whitworth brings this action to address the violations of her rights secured by the following:

a.   Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq. as amended;

b.   Equal Pay Act, 29 U.S.C. § 206(d);

c.   Clarke-Figures Equal Pay Act (CFEPA), ALA. CODE 1975 § 25-1-30; and

d.   The laws of the State of Alabama.

2.   Supplemental Jurisdiction is proper pursuant to 28 U.S.C. § 1367. All of Ms. Whitworths's claims arise out of a common nucleus of operative fact.

3.   Venue lies within the Northern District of Alabama pursuant to 28 U.S.C. § 1391.

## PARTIES

4.   Ms. Whitworth is a female over the age of nineteen (19). Ms. Whitworth is a resident of Jefferson County, and was employed by the Mezrano Law Firm in Jefferson County, Alabama.

5.   Defendant, Mezrano Law Firm is a domestic professional corporation. At all times relevant to this Complaint, Mezrano Law Firm was, and is, doing business in Jefferson County Alabama, within the Northern District of Alabama. Mezrano Law Firm employs at least fifteen (15) persons within the meaning of Title

VII, 42 U.S.C. § 2000e(b), as amended. Mezrano Law Firm is an enterprise engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. § 203(s)(l).

6.     Defendant Steven Mezrano is an individual over the age of nineteen (19). Mr. Mezrano is the owner of the Mezrano Law Firm and a resident of Shelby County, Alabama.

## ADMINISTRATIVE PROCEDURES

7.     On June 24, 2019, within 180 days of the acts of discrimination of which she complains, Ms. Whitworth filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). **(See Exhibit A).**

8.     Ms. Whitworth received a Notice of Right to Sue from the EEOC on January 17, 2020. **(See Exhibit B).**

9.     Ms. Whitworth, Mr. Mezrano and Mezrano Law Firm entered into a tolling agreement on April 14, 2020. The parties agreed to toll the statute of limitations until May 31, 2020. **(See Exhibit C).**

10.     Ms. Whitworth has met all prerequisites for the filing of this lawsuit.

## STATEMENT OF FACTS

11.     Ms. Whitworth is a female and an attorney licensed to practice law in the State of Alabama.

12.     Ms. Whitworth was hired to work at the Mezrano Law Firm by Mr.

Mezrano on August 1, 2016.

13.     After Ms. Whitworth was hired, Mr. Mezrano praised Ms. Whitworth's work performance and told her, "You are the best hire I ever made." Up until her complaint of discrimination and harassment, Ms. Whitworth was one of the highest producing attorneys at Mezrano Law Firm. She was never written up, disciplined or otherwise counseled regarding her work performance until after she complained of sexual harassment.

**Mr. Mezrano's Sexual Comments**

14.     Within a few weeks of beginning her employment, Mr. Mezrano began making inappropriate, gender biased, and sexual comments to Ms. Whitworth. On one occasion, Mr. Mezrano drove Ms. Whitworth and another attorney to and from a court hearing. During the drive, Mr. Mezrano referenced Ms. Whitworth as a "dirty girl" and said, "I bet you are dirty in more ways than one." While making this comment, Mezrano snickered. Ms. Whitworth was immediately uncomfortable and did not respond to Mr. Mezrano's remarks, but instead sat silent.

15.     A few weeks later, Ms. Whitworth attended a mediation with Mr. Mezrano. While sitting at the table with Ms. Whitworth, the client, and the client's wife, Mr. Mezrano recounted the sexual escapade of a male friend. Mezrano graphically recounted the details which included Mezrano describing how the friend ejaculated on the woman's stomach. Ms. Whitworth was shocked at Mezrano's story

and graphic language and kept her head down while Mezrano described the encounter.

16.     Mr. Mezrano became emboldened by Ms. Whitworth's silence and frequently brought up sex in conversations with Ms. Whitworth. Mr. Mezrano commented on Ms. Whitworth's physical appearance and clothing while looking her up and down, making Ms. Whitworth uncomfortable, embarrassed and shameful.

17.     When Ms. Whitworth wore dresses to work, Mr. Mezrano would make inappropriate comments and use a suggestive tone saying "You look good," "I like it when you wear dresses," and "I need to buy my wife that dress." Mr. Mezrano also stated, "I wish I was as tall and beautiful as you," and "We can't all be as tall and beautiful as you." While making these comments Mezrano would look Ms. Whitworth up and down and on some occasions lean in toward Ms. Whitworth.

18.     Mr. Mezrano also bragged to Ms. Whitworth about his numerous sexual encounters he previously had engaged with one of the firm's clients and referred to this client as his "f--- buddy." He also bragged and graphically described his sexual encounters with other women. These stories made Ms. Whitworth uncomfortable and she sought out excuses not to be alone with Mezrano.

19.     Mr. Mezrano created a culture at the firm that objectified and demeaned females. Other male attorneys in the firm, specifically Stewart Springer ("Mr. Springer") often made comments about having sex with clients. Mr. Mezrano and

5

Mr. Springer often mocked one female client, who was missing several teeth, and would joke that she likely performed good oral sex. The comments made by Mezrano and the other male attorney were mortifying and shocking for Ms. Whitworth.

20.     On one occasion, while preparing for a court hearing, Springer told Ms. Whitworth in the presence of her paralegal that she was "going to win because [she] looks so beautiful today." Neither Ms. Whitworth nor her paralegal replied to Springer.

**Mr. Mezrano's Sexual Propositions**

21.     Mr. Mezrano did not stop with only verbal sexual harassment of Ms. Whitworth, but his actions often became physical. He would hug Ms. Whitworth, pressing his body against her for no reason. On one occasion, Mr. Mezrano told Ms. Whitworth that "she owed him" and used this as an excuse to then hug her. Ms. Whitworth did not invite nor return Mr. Mezrano's hugs.

22.     Mr. Mezrano found reasons to come into Ms. Whitworth's office and sit down beside her. Mr. Mezrano was extremely "handsy" and constantly reached out and touched Ms. Whitworth on her shoulders, her back and waist. Ms. Whitworth did not invite nor return Mr. Mezrano's touch.

23.     One day Mr. Mezrano came into Ms. Whitworth's office and asked Ms. Whitworth to kiss him on the cheek. Ms. Whitworth was sitting at her desk and Mr.

Mezrano stood next to her, bent over from the waist, and tapped on his cheek, indicating where he would like to be kissed. Ms. Whitworth refused and said "I'm not going to do that."

24.     In February or March of 2018, Ms. Whitworth was preparing for a business trip to Missouri to take depositions. Mr. Mezrano proposed that Ms. Whitworth and Mr. Mezrano share a hotel room during the trip and stated, "I won't tell anybody if you won't." Ms. Whitworth turned down Mr. Mezrano's proposal and offered to pay for her own room and flight. Ms. Whitworth also planned to bring her paralegal with her on the trip and pay the expenses herself, because she anticipated another sexual proposition from Mr. Mezrano and was scared to be alone with him.

25.     Ms. Whitworth never indicated that the sexual advances from Mr. Mezrano were welcomed and she never returned the sexual advances by Mr. Mezrano.

**Ms. Whitworth Complained of Sexual Harassment**

26.     When Ms. Whitworth began her employment in 2016, Mezrano Law Firm had no human resources department. In Fall 2017, Dawn Carre ("Ms. Carre") was hired to manage personnel, train employees, and facilitate other activities typically performed by a Human Resources department. However, Ms. Carre did not serve in this role and actually worked as Mr. Mezrano's case manager and performed

legal work on Mr. Mezrano's cases. Ms. Carre did not maintain a policy of confidentiality; if employees spoke to Ms. Carre about something, it would later be relayed directly to Mr. Mezrano.

27.     Mezrano Law Firm had no policies and no employee handbook. There was no sexual harassment policy that indicated how and to whom Ms. Whitworth should complain of sexual harassment.

28.     Ms. Whitworth was fearful that on her upcoming business trip to Missouri, Mr. Mezrano would attempt to sexually accost her. Ms. Whitworth complained about the sexual harassment she had been experiencing to Erin Adams ("Ms. Adams") in March 2018. Ms. Whitworth complained to Ms. Adams because Ms. Whitworth knew of no one else in authority to whom she could report Mr. Mezrano. Ms. Whitworth could not complain to Ms. Carre, because she knew Ms. Carre would communicate her complaints to Mr. Mezrano. Ms. Whitworth was fearful that Mr. Mezrano would retaliate against her if she complained.

29.     Ms. Whitworth told Ms. Adams about her fears of retaliation. Ms. Whitworth anticipated that Mr. Mezrano would sexually proposition her on their business trip and wanted to inform Ms. Adams that she would likely suffer retaliation for refusing Mr. Mezrano and his continued sexual advances. Ms. Adams offered no advice or assistance to Ms. Whitworth relating to her complaints.

30.     After Ms. Whitworth confided and reported the harassment to Ms.

Adams, Ms. Adams told Mr. Mezrano about her complaints. Immediately after she complained, Mr. Mezrano began openly retaliating against Ms. Whitworth and demeaning her within the firm and to others outside the firm, specifically to attorneys Ms. Whitworth had a professional relationship.

31.     Mr. Mezrano became openly critical of Ms. Whitworth's work product, attendance, and office hours, none of which had been problematic before she complained of sexual harassment.

## Mr. Mezrano Excluded and Ignored Ms. Whitworth

32.     Prior to reporting his behavior, Ms. Whitworth was frequently invited to join the other Mezrano lawyers for lunch. Additionally, Mr. Mezrano would generally make himself available to meet with Ms. Whitworth to answer any questions she had about cases she was managing.

33.     After Ms. Whitworth complained of sexual harassment, Mr. Mezrano began excluding from her from firm communications and did not inform her about firm meetings until after the meetings concluded. Mr. Mezrano also refused to meet with Ms. Whitworth and stopped inviting her to firm-wide meetings and firm lunches. Ms. Whitworth became concerned that her work product was being intentionally sabotaged and she was being set up for failure.

34.     Mr. Mezrano excluded Ms. Whitworth from the firm's commercial. All other attorneys were included in the commercial. When Ms. Whitworth confronted

9

Mr. Mezrano about the exclusion, Mr. Mezrano told Ms. Whitworth that the commercial was not being filmed on that particular day, when in fact, it was.

35.    Mr. Mezrano hosted a commercial viewing session for all Mezrano Law Firm staff and attorneys, except for Ms. Whitworth.

36.    Following the report of sexual harassment, Mr. Mezrano stopped communicating with Ms. Whitworth almost entirely, but blamed her for the total breakdown in communication. He began relaying information to Ms. Whitworth through her case managers instead of communicating directly with Ms. Whitworth.

37.    Mr. Mezrano blamed Ms. Whitworth for the lack of communication, although he routinely failed to respond to her emails, text messages, or phone calls about case related matters. Mr. Mezrano refused to cooperate with Ms. Whitworth, which inhibited Ms. Whitworth's job performance. Mr. Mezrano gave Ms. Whitworth no authority over her cases, yet failed to respond to her requests for approval to proceed. Therefore, Ms. Whitworth was inhibited in her ability to generate revenue and perform her job duties. Ms. Whitworth became anxious and stressed that Mezrano was withholding critical information on cases she was working so as to cause her to malpractice a client's case.

38.    On one occasion in Fall 2018, Mr. Mezrano told Ms. Whitworth that she could manage one of his litigation cases; however, he gave her no actual authority over the case. When Ms. Whitworth emailed Mr. Mezrano a joint motion

drafted and proposed by opposing counsel, Mr. Mezrano responded via email not only to Ms. Whitworth, but copied numerous other supervisors and employees in the firm, belittling Ms. Whitworth. Mr. Mezrano invented reasons to embarrass and humiliate Ms. Whitworth in front of other firm employees.

39.     In Spring 2019, Mr. Mezrano held a meeting with all Mezrano Law Firm attorneys to discuss each attorney's case load and upcoming deadlines. Mr. Mezrano refused to look at Ms. Whitworth or acknowledge her during the meeting. His conduct of exclusion was obvious to everyone in the meeting. He also refused to discuss her cases, although every other attorney's cases were reviewed during the meeting.

## Mr. Mezrano's Sexist Remarks About Mothers and Pregnant Women

40.     Mr. Mezrano's third child was born shortly after Ms. Whitworth began her employment at Mezrano Law Firm. Occasionally Mr. Mezrano brought his child to the firm and often paraded her throughout the office. Mr. Mezrano repeatedly brought his child into Ms. Whitworth's office and made comments about how the child "looked like mommy."

41.     Mr. Mezrano told Ms. Whitworth that he believed the two would "make pretty babies". Mr. Mezrano admitted to Ms. Whitworth that, at his prior firm, he made a comment to a pregnant, female employee about her breast size, then told the employee that he would "have pretty babies" with her.

11

42.     When Ms. Whitworth was hired, she informed Mr. Mezrano that she needed to leave work each day at 4:30 p.m. to pick up her son from preschool. Mr. Mezrano expressed no concerns about Ms. Whitworth's departure time and reassured her that Mezrano Law Firm was a family-friendly environment. However, Mr. Mezrano routinely held meetings with all attorneys at 7:00 a.m. and 4:30 p.m., which Ms. Whitworth could not attend due to daycare drop-off times.

43.     One afternoon in the Fall of 2016, an attorneys' meeting was scheduled at 4:15 p.m., but Mr. Mezrano delayed the meeting until 4:40 p.m. in order to accommodate Mr. Springer, who was extremely tardy. Mr. Mezrano did not utter a complaint about Mr. Springer's tardiness. Ms. Whitworth stayed at the meeting as long as she could, but ultimately had to leave to pick up her son shortly after the meeting began.

44.     After Ms. Whitworth excused herself from the meeting, Mr. Mezrano exclaimed, "What time does that damn daycare close?"

45.     Mr. Mezrano suggested Ms. Whitworth hire a babysitter to keep her son so she could work more, despite the fact that she was one of the top producers at the firm given her caseload. Mr. Mezrano never told a male attorney to hire a babysitter so they could work more hours.

**Mr. Mezrano Spread Lies and Rumors About Ms. Whitworth**

46.     Mr. Mezrano would spread outrageous and demeaning lies about Ms.

Whitworth to her colleagues within the firm and outside of the firm. These lies negatively impacted and tarnished Ms. Whitworth's professional reputation.

47.   In Fall 2018, Mr. Mezrano took Ms. Whitworth to lunch at a restaurant. During lunch, Mr. Mezrano proudly told Ms. Whitworth about a rumor at another law firm that Mr. Mezrano and Ms. Whitworth were having an affair. Mezrano seemed pleased about the rumor. Ms. Whitworth was horrified by Mr. Mezrano's disclosure.

**Mezrano Law Firm's Retalitory Restructuring**

48.   In March 2018, immediately after Ms. Whitworth complained to Ms. Adams, Mr. Mezrano restructured the firm and created two separate departments: the non-litigation department, which was comprised of Ms. Adams and Ms. Whitworth, and the litigation department, which was comprised of Mr. Romeo, Ms. Bruce, and Mr. Mezrano.

49.   Mr. Mezrano informed the other lawyers of the firm, but did not inform Ms. Whitworth about this restructuring; Ms. Whitworth learned about the company restructuring from her paralegal.

50.   Ms. Whitworth was later told that she and Ms. Adams would handle exclusively non-litigation cases in the new set-up, and that they would be required to send the remainder of their litigation caseload over to the new litigation department. However, Ms. Whitworth was specifically told that she would be able

to keep as many as fifteen of her best litigation cases, in addition to exclusively non-litigation case list.

51.    After the firm restructure was completed in May of 2018, Ms. Whitworth learned that she was the only attorney in the firm who was not allowed to maintain any of her previous cases; Mrs. Adams maintained several high-value litigation cases and Mr. Romeo maintained several high-value non-litigation cases.

52.    Ms. Whitworth was extremely concerned that she would suffer significant income loss because she was required to transfer all of her high value litigation cases to Mr. Romeo. Ms. Whitworth confronted Mr. Mezrano when she discovered that, in addition to the 80 high-value litigation cases transferred to Mr. Romeo's case list from Ms. Whitworth's, Mr. Romeo had been allowed to keep high value, non-litigation cases, that otherwise should have been transferred to the non-litigation department.

53.    Mr. Mezrano became enraged at Ms. Whitworth for "going behind his back", when she confirmed her suspicions upon looking through Mr. Romeo's post-transfer case list. Mr. Mezrano treated Ms. Whitworth poorly and indicated she had betrayed him and told her that she was disloyal.

54.    Despite Ms. Whitworth's repeated attempts, Mr. Mezrano refused to directly address her concerns about the inevitable loss of income she would experience following the firm restructure; rather, Mr. Mezrano tried to convince Ms.

Whitworth that she should just trust him because he would take care of her.

55.     The litigation department was entirely composed of male attorneys except for Mary Bruce, the sole female, who was terminated two months later, in July 2018. Upon information and belief, Ms. Bruce had pending or later filed an EEOC Charge of discrimination and harassment against the Mezrano Law Firm.

56.     Mr. Mezrano evaluated the value of all pending litigation cases. Mr. Mezrano assigned the highest value cases to Mr. Romeo and the lowest value cases to the litigation department's only female employee, Mary Bruce.

## Ms. Whitworth's Loss in Income

57.     Ms. Whitworth's transfer to the non-litigation department significantly impacted her income. Prior to her transfer, Ms. Whitworth worked on a case for two years that ultimately resulted in a $350,000 jury verdict. Mr. Mezrano transferred this case to a male employee, Bruce Romeo ("Romeo") in May 2018. When Mr. Romeo received the case, it was ready for trial; Ms. Whitworth performed all of the work on this case prior to transferring it to Mr. Romeo. Ms. Whitworth would have received 25% of the attorney's fee if she had been allowed to retain the case; instead, Mr. Romeo received the 25% attorney fee from that case.

58.     Mr. Mezrano reduced Ms. Whitworth's case load from 300 active cases to 120 active cases. This reduced Ms. Whitworth's income because only 60 of Ms. Whitworth's cases could be worked at that time. Ms. Whitworth complained to no

avail about this negative treatment.

59.     Before she complained of sexual harassment, Ms. Whitworth maintained the most litigation cases in the firm. However, during the company restructuring, Mr. Mezrano forced her to transfer all eighty (80) of her litigation cases to Mr. Romeo. Ms. Whitworth only received sixty (60) cases in return from Mr. Romeo, half of which were ready to be closed out, turned down, or had questionable liability.

60.     At the beginning of 2019, Ms. Whitworth spoke to Mrs. Adams about two high-value, non-litigation cases she was working on and was excited to start negotiations on behalf of the clients. Within days of this discussion, Mezrano transferred the two cases away from Ms. Whitworth, without discussion or explanation. After Ms. Whitworth was terminated, she learned that the two cases were then transferred to Mrs. Adams from Mezrano.

61.     After January 2019, Ms. Whitworth was given very few cases and only given cases with questionable liability or low value. Mr. Mezrano and the Mezrano Law Firm withheld valuable cases from her to ensure that she received little to no compensation in an attempt to damage her financially and force her to quit.

**Mr. Mezrano Set Ms. Whitworth Up for Failure and Termination**

62.     Mr. Mezrano worked to set Ms. Whitworth up for failure and find reasons to terminate her or force her to quit.

63.    Mr. Mezrano indicated that Ms. Whitworth was incompetent and was deficient in her obligations to her clients. Mr. Mezrano cast Ms. Whitworth in a negative light in front of her coworkers and clients. For example, one day Mr. Mezrano allegedly took a call from a client with whom Ms. Whitworth had a close, professional relationship. The following day, Mr. Mezrano walked down the hallway, loudly exclaiming that the client said Ms. Whitworth never returned the client's calls and complained that Ms. Whitworth was not doing a good job on the client's case.

64.    Ms. Whitworth knew the client would never speak so negatively about her because Ms. Whitworth spent hours on the phone each week with this client and the client maintained Ms. Whitworth's cell phone number and could contact her at any time.

65.    In Fall 2018, after the restructuring, Mr. Mezrano routinely reprimanded Ms. Whitworth for her failure to continue working cases that were no longer hers and had been transferred to Mr. Romeo. There were three particular clients that Mr. Romeo failed to call, email, or otherwise communicate with. When the clients called the firm, or in one case, fired Mr. Romeo as their attorney, Mr. Mezrano blamed Ms. Whitworth for not communicating with the client, although the case was no longer hers. On one such occasion, Mr. Mezrano told Ms. Whitworth over the phone that he expected her to make sure Mr. Romeo returned his clients'

phone calls. When Ms. Whitworth told Mr. Mezrano that she didn't have time to make sure Mr. Romeo did his job, Mr. Mezrano screamed "Then I'll find somebody who will!", and hung up on her.

66.     Mr. Mezrano then required Ms. Whitworth to be the exclusive point of contact, and perform other legal tasks, for several clients whose cases were transferred to Mr. Romeo during the restructure. Ms. Whitworth was often required to contact these clients and apologize for Mr. Romeo's failure to communicate with them, and for the lack of personal service and attention their cases had received after being transferred from her. Ms. Whitworth was required to perform these duties to ensure that those clients would remain satisfied and continue to employ the firm. Ms. Whitworth was not given any payment for the extra work she performed on these cases so Mr. Romeo could achieve his assigned goals. No male attorney was required to work without compensation on cases that were not directly assigned to them. In essence Ms. Whitworth was delegated to performing Mr. Romero's administrative tasks.

67.     One day in Fall 2018, a client of Mr. Romeo's came into the firm and demanded to speak to Mr. Romeo. Mr. Mezrano forced Ms. Whitworth to meet with her former client, who had come in specifically to complain that he could never get a phone call back from Mr. Romeo. This client loudly, and repeatedly, threatened to terminate Mezrano Law Firm. Mr. Mezrano required Ms. Whitworth to immediately

meet with Mr. Romeo's client and to help him obtain a cash advance against the proceeds of his personal injury settlement. After Ms. Whitworth calmed the client, and persuaded him to allow Mezrano Law Firm to continue representing him, she submitted the loan paperwork for the client and then confirmed with him that he had been approved for a certain advancement.

68.     At the close of the meeting, and over the client's strong objection, Ms. Whitworth informed the client that, while she would remain the point of contact on his case, Mr. Romeo would actually be litigating his case.

69.     A few days after Ms. Whitworth's meeting with the above-referenced client, Mr. Mezrano called Ms. Whitworth into his office and demanded to know why she failed to have the above client sign a certain statement, drafted by Stewart Springer, that discourages clients from making cash advances against their settlements. It was well known that Mr. Springer always had his clients sign this statement when they requested a case loan.

70.     Mr. Mezrano told Ms. Whitworth that he had previously instructed all of the attorneys to have their clients execute the above statement in connection with case loans, and berated her for deviating from firm policy in that regard.

71.     Ms. Whitworth was never informed that clients were required to sign this statement. Mrs. Adams confirmed that Mr. Mezrano never instructed her to use this statement and had not mandated that the attorneys use them, as Mr. Mezrano

claimed. Mr. Mezrano used this opportunity he created to set up Ms. Whitworth for failure, discipline, and termination.

72.    In January 2019, Mr. Mezrano approached Ms. Whitworth and informed her that she had not settled enough cases. This was the first time Mr. Mezrano ever brought up Ms. Whitworth's lack of production. Mr. Mezrano said Ms. Whitworth only averaged twelve settled cases per month and the firm's goal was twenty. Ms. Whitworth told Mr. Mezrano that she did not have enough workable cases to settle twenty cases per month. He also told Ms. Whitworth that she should consider hiring a babysitter for her toddler son so she could work more hours to achieve the metrics he had established. No male attorney was ever told to work more hours or hire a babysitter.

**Ms. Whitworth's Termination**

73.    On March 27, 2019, Mr. Mezrano called Ms. Whitworth into his office. When Ms. Whitworth arrived, Mr. Mezrano, Mr. Romeo and Ms. Carre were already seated in Mr. Mezrano's office. Mr. Mezrano told Ms. Whitworth that Mr. Romeo could not locate a set of documents relevant to a case that had been transferred to him a year earlier; however, prior to her termination, no discussion was ever had with Ms. Whitworth regarding any such documents. Mr. Mezrano drafted a write-up that he placed in Ms. Whitworth's file and Ms. Whitworth's paralegal's file. This was the only written disciplinary action Ms. Whitworth ever received prior to her

termination.

74.    Ms. Whitworth confronted Mr. Mezrano about the lies he was spreading regarding her work performance. Mr. Mezrano began screaming at Ms. Whitworth and told her to return to her office.

75.    Mr. Mezrano then terminated Ms. Whitworth stating, "You are dismissed." Mr. Mezrano gave no reason for terminating Ms. Whitworth.

**Post-Termination Harassment and Retaliation**

76.    Mr. Mezrano continued to harass Ms. Whitworth, even after she was terminated from the Mezrano Law Firm.

77.    On April 15, 2019, Ms. Whitworth began employment with another law firm, Vernis & Bowling of Birmingham, LLC ("Vernis & Bowling").

78.    Mr. Mezrano moved to disqualify Ms. Whitworth and Vernis & Bowling from representing one of their clients. Mezrano Law Firm represented the other party in the suit, and Mr. Mezrano alleged that Ms. Whitworth and Vernis & Bowling had a conflict of interest, even though Ms. Whitworth did not work on the file, nor did she have any knowledge of the file while she was at the Mezrano Law Firm. The judge in that case determined that Mr. Mezrano's claims lacked merit, and denied his Motion to Disqualify Ms. Whitworth's new firm from representing their client. Mr. Mezrano continued his work to cause Ms. Whitworth financial harm or to cause Vernis & Bowling to terminate Ms. Whitworth's employment.

79.    Ms. Whitworth filed an EEOC Charge of Discrimination against the Mezrano Law Firm on June 24, 2019.

## COUNT ONE

**TITLE VII SEX DISCRIMINATION, HARASSMENT AND RETALIATION AGAINST MEZRANO LAW FIRM**

80.    Ms. Whitworth realleges paragraphs 1, 3–5, 7–79 as if fully set out herein.

81.    Ms. Whitworth is a female and a member of a protected class.

82.    Mezrano Law Firm targeted Ms. Whitworth based on her sex and subjected her to adverse treatment.

83.    Ms. Whitworth's sex was a motivating factor in Mezrano Law Firm's decision to subject Ms. Whitworth to adverse employment actions including differing terms of employment, pay raises, and equal pay to that of her male coworkers. *Quigg v. Thomas County Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016).

84.    Ms. Whitworth suffered less preferential terms and conditions of employment than similarly-situated male employees.

85.    Ms. Whitworth was terminated by a male and after her termination, males were given cases, and therefore income, that Ms. Whitworth was denied.

86.    Ms. Whitworth was subject to gender derogatory and sexual remarks from her supervisor.

87.     Mr. Mezrano frequently made sexual comments to Ms. Whitworth, sexually propositioned her, commented on how she looked, and attempted to touch and kiss her.

88.     Mr. Mezrano talked about his past sexual encounters with Ms. Whitworth and called her a "dirty girl."

89.     Mr. Mezrano's sexual harassment of Ms. Whitworth was so severe and pervasive that Ms. Whitworth's terms and conditions of employment were materially altered.

90.     Ms. Whitworth was forced to move to the non-litigation department, where she was stripped of cases and sources of income.

91.     Ms. Whitworth complained about gender discrimination to Ms. Adams.

92.     Ms. Whitworth's complaints were never investigated or remedied.

93.     Ms. Whitworth suffered retaliation after she complained of gender discrimination. Ms. Whitworth was only terminated after her complaints of gender discrimination.

94.     After Ms. Whitworth complained of gender discrimination, she was placed in the non-litigation department and given lower value cases. No male employees were moved to the non-litigation department and given low value cases.

95.     Ms. Whitworth was asked to hire a babysitter so that she could work additional hours. No male employees at the Mezrano Law Firm were asked to hire

babysitters.

96.     In retaliation for Ms. Whitworth's complaints, Mr. Mezrano attempted to have Ms. Whitworth and her current firm disqualified from representing a client due to an alleged conflict of interest.

97.     Such unlawful employment practices proximately caused Ms. Whitworth to suffer severe emotional distress, mental anguish, embarrassment, humiliation, shame, trauma, financial loss, and loss of employment opportunity for which she claims damages.

98.     Ms. Whitworth seeks declaratory and injunctive relief, award of lost wages, back pay, front pay, interest, nominal, compensatory and punitive damages for humiliation, embarrassment, and mental anguish, costs, attorneys' fees and any and all such other relief the trier of fact may assess.

## COUNT TWO

### EQUAL PAY ACT AND CLARK-FIGURES EQUAL PAY ACT AGAINST MEZRANO LAW FIRM

99.     Ms. Whitworth realleges paragraphs 1–5, 7–79, as if fully set out herein.  This is a claim alleging violations of the Equal Pay Act, 29 U.S.C. § 206(d) and the Clarke-Figures Equal Pay Act (CFEPA), ALA. CODE 1975 § 25-1-30. The Equal Pay Act and the CFEPA prohibit an employer from discriminating between employees on the basis of sex by paying wages to employees at a rate less than the

rate at which the employer pays wages to employees of the opposite sex for equal work on jobs, the performance of which requires equal skill, effort, education, experience, and responsibility, and which are performed under similar working conditions.

100.   Mezrano Law Firm paid male employees more than Ms. Whitworth for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions.

101.   Ms. Whitworth and another female employee were transferred to the non-litigation department. No males were transferred to this department.

102.   Ms. Whitworth was given low value cases which reduced her income.

103.   Prior to her transfer, Ms. Whitworth was working on a case for two years that was transferred to a male employee in May 2018 who ultimately obtained a $350,000 verdict. Ms. Whitworth would have received 25% of the verdict if she had not been transferred and had been involved in the trial.

104.   Mr. Mezrano reduced Ms. Whitworth's case load from 300 active cases to 120 active cases which reduced Ms. Whitworth's income because only 60 of her cases could be worked at the time.

105.   After she was terminated, Mr. Mezrano immediately transferred eight (8) new cases to each of Ms. Whitworth's prior case managers. Mr. Mezrano and Mezrano Firm withheld valuable cases from Ms. Whitworth.

106.   Ms. Whitworth was required to perform work that Mr. Romeo failed to accomplish and remedy Mr. Romeo's mistakes. Ms. Whitworth was not compensated for this work she performed.

107.   The differences in pay between the male employees and Ms. Whitworth were not made pursuant to a seniority system, a merit system, a system which measures earnings by quantity or quality of production, or a differential based on any other factor other than sex.

108.   Ms. Whitworth seeks declaratory and injunctive relief, including unpaid minimum wages as defined in 29 U.S.C. § 216(b), an additional equal amount in liquidated damages, and attorney's fees and costs.

## COUNT THREE

### INVASION OF PRIVACY AGAINST STEVEN MEZRANO AND MEZRANO LAW FIRM

109.   Ms. Whitworth realleges paragraphs 1–10, 12–79 as if fully set out herein. This is a claim for invasion into Ms. Whitworth's privacy based on the laws of the State of Alabama.

110.  Mr. Mezrano invaded Ms. Whitworth's personal and emotional sanctum by attempting to touch and kiss her against her will.

111.  Mr. Mezrano sexually propositioned Ms. Whitworth and attempted to persuade her to spend the night with him in his hotel room.

112.  Mr. Mezrano called Ms. Whitworth a "dirty girl" and made

inappropriate comments about how "tall and beautiful" Ms. Whitworth appeared.

113.   Mr. Mezrano told Ms. Whitworth that he would have "pretty babies" with her.

114.   Mezrano Law Firm invaded Ms. Whitworth's privacy by ratifying Mr. Mezrano's decisions to harass Ms. Whitworth.

115.   Mezrano Law Firm had actual notice of the actions complained of by Ms. Whitworth.

116.   Mezrano Law Firm knew of discriminatory and harassing comments and touches Ms. Whitworth was subjected to by Mr. Mezrano.

117.   Ms. Whitworth complained about the gender discrimination and harassment she was facing.

118.   Mezrano Law Firm having such knowledge, ratified Mr. Mezrano's conduct by failing to investigate, remedy, or otherwise respond to Ms. Whitworth's complaints of discrimination and retaliation.

119.   Mr. Mezrano placed Ms. Whitworth in a false light with others in the legal community by portraying her as unprofessional.

120.   Mr. Mezrano started and spread rumors to other attorneys and law firms that Mr. Mezrano and Ms. Whitworth were having an affair.

121.   Mr. Mezrano placed Ms. Whitworth in a false light with her peers and coworkers by loudly announcing to the whole firm that Ms. Whitworth was a bad

attorney who failed to properly communicate with her clients.

122.   Mezrano Law Firm, through Mr. Mezrano, placed Ms. Whitworth in a false light with her peers, her fellow employees, her clients, and her business contacts by moving her to a less prestigious position in the firm and later terminating her.

123.   Mezrano Law Firm's false portrayal of Ms. Whitworth's employment damaged her relationships and reputation in the legal community.

124.   Mr. Mezrano and Mezrano Law Firm's conduct proximately caused Ms. Whitworth to suffer embarrassment, humiliation, shame, pain and suffering, loss of reputation, loss of career opportunity, emotional distress, loss of pay and benefits, and mental anguish for which she claims damages.

125.   Ms. Whitworth seeks declaratory and injunctive relief, award of nominal, compensatory and punitive damages for humiliation, embarrassment, and mental anguish, costs, interest, attorneys' fees, and any other such relief as the trier of fact may assess.

## **COUNT FOUR**

## **NEGLINGENT HIRING, TRAINING, SUPERVISION, AND RETENTION AGAINST MEZRANO LAW FIRM**

126.   Ms. Whitworth realleges paragraphs 1–5, 7–79 as if fully recited herein. This is a claim arising under the laws of the State of Alabama to redress the negligent hiring, training, supervision and retention of Mr. Mezrano.

127.   Mezrano Law Firm had a duty to provide a reasonably safe, non-hostile and non-discriminatory work environment to Ms. Whitworth and other employees in protected categories.

128.   Mezrano Law Firm breached its duty owed to Ms. Whitworth when it failed to train Mr. Mezrano and other employees on polices against discrimination and harassment or otherwise eradicate behavior that created a hostile work environment.

129.   As a proximate result of Mezrano Law Firm's unlawful conduct, Ms. Whitworth suffered adverse terms and conditions of employment, financial loss, humiliation, mental anguish, trauma and embarrassment, loss of reputation, and loss of career opportunity.

130.   Mezrano Law Firm had actual notice of the actions complained of by Ms. Whitworth.

131.   Mezrano Law Firm knew of the discriminatory work conditions, rates of pay, and harassment Ms. Whitworth was subjected to by Mr. Mezrano.

132.   Ms. Whitworth complained about the gender discrimination and sexual harassment she was facing.

133.   Mezrano Law Firm having such knowledge, negligently failed to train and discipline Mr. Mezrano who actively discriminated, harassed, retaliated and conspired against Ms. Whitworth.   Mezrano Law Firm failed to protect Ms.

Whitworth from injury.

134.   Ms. Whitworth seeks declaratory and injunctive relief, award of lost employment benefits and wages, back pay, front pay, interest, nominal, compensatory and punitive damages for humiliation, embarrassment, and mental anguish, costs, attorneys' fees, and any and all such other relief the trier of fact may assess.

## COUNT FIVE

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST STEVEN MEZRANO AND MEZRANO LAW FIRM

135.   Ms. Whitworth realleges 1–10, 12–79, as if fully recited herein. This is a claim arising under the laws of the State of Alabama which prohibit the intentional infliction of emotional distress.

136.   Mr. Mezrano's adverse treatment of Ms. Whitworth, in particular his subjection of her to severe, degrading, and humiliating discrimination and harassment, despite her complaints, was outrageous, extreme, and beyond the bounds of decency.

137.   Mr. Mezrano made sexual comments and gender derogatory remarks to Ms. Whitworth.

138.   Mr. Mezrano sexually propositioned Ms. Whitworth and attempted to touch and kiss her inappropriately.

139.   Mr. Mezrano called Ms. Whitworth a "dirty girl" and described his past

sexual encounters to Ms. Whitworth.

140.   Mr. Mezrano told Ms. Whitworth that he would have "pretty babies" with her.

141.   Mr. Mezrano intentionally worked to embarrass Ms. Whitworth by starting and spreading rumors that Ms. Whitworth was having an affair with Mr. Mezrano throughout the legal community.

142.   Mr. Mezrano humiliated Ms. Whitworth by loudly telling all of Ms. Whitworth's coworkers that she was a bad attorney who failed to properly communicate with her clients.

143.   Mezrano Law Firm knew about his discriminatory and harassing conduct, yet it failed to investigate of remedy Ms. Whitworth's complaints.

144.   Mezrano Law Firm ratified Mr. Mezrano's conduct, which was intentional, willful, and employed to inflict severe emotional distress upon Ms. Whitworth.

145.   Mr. Mezrano's conduct, ratified by Mezrano Law Firm, is not condoned by society and should not go unpunished.

146.   As a proximate result of Mezrano Law Firm's unlawful conduct, Ms. Whitworth suffered adverse terms and conditions of employment, financial loss, humiliation, mental anguish, trauma and embarrassment, loss of reputation, and loss of career opportunity.

147.   Ms. Whitworth seeks declaratory and injunctive relief, award of lost employment benefits and wages, back pay, front pay, interest, nominal, compensatory and punitive damages for humiliation, embarrassment, and mental anguish, costs, attorneys' fees, and any and all such other relief the trier of fact may assess.

**WHEREFORE**, Plaintiff respectfully requests this Court:

A.     Grant a permanent injunction enjoining Defendant, its officers, successors, assigns and all persons in active concert or participation with it, from engaging further in its discriminatory treatment on the basis of gender and retaliation based on protected activity;

B.     Order Defendant to institute and carry out policies, practices and programs which provide equal provisions and employment opportunities for all employees, and which eradicate the effects of its past and present unlawful employment practices, including implementing policies against gender and age discrimination in the work place and against retaliation for engaging in protected activities;

C.     Order Defendant to make Ms. Whitworth whole by providing front pay, back pay, with prejudgment interest, back pay with prejudgment interest, in amounts to be proved at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices, including, but not limited to, Mr. Mezrano's

termination, compensatory damages, punitive and liquidated damages;

     D.    Award the Plaintiff nominal, compensatory, punitive and liquidated damages;

     E.    Award the Plaintiff her costs and expenses herein, including reasonable attorney fees; and,

     F.    Award such other and further relief which this Court deems necessary and proper.

**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY**

Respectfully submitted,

*/s/ Alicia K. Haynes*
Alicia K. Haynes
Attorney for Plaintiff

**OF COUNSEL:**
**HAYNES & HAYNES, P.C.**
1600 Woodmere Drive
Birmingham, AL 35226
Phone: (205) 879-0377
Email: akhaynes@haynes-haynes.com

**PLEASE SERVE DEFENDANTS VIA CERTIFIED MAIL:**
Mezrano Law Firm, P.C.
c/o Steven Mezrano, Registered Agent
1745 Oxmoor Road
Homewood, AL 35209

Steven Mezrano
Mezrano Law Firm, P.C.
1745 Oxmoor Road
Homewood, AL 35209

**PLAINTIFF'S ADDRESS:**
Ms. Jennifer Whitworth
c/o Alicia Haynes
Haynes & Haynes, P.C.
1600 Woodmere Drive
Birmingham, AL 35226