**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| JENNIFER WHITWORTH, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | Case No.:  2:20-cv-00756-RDP-HNJ |
| | } | |
| STEVEN MEZRANO AND MEZRANO | } | |
| LAW FIRM, P.C., | } | |
| | } | |
| Defendants. | } | |

**<u>MEMORANDUM OPINION</u>**

This matter is before the court on the Parties' cross Motions for Summary Judgment. (Docs. # 105, 107). The Motions have been fully briefed (Docs. # 106, 108, 116, 119, 130, 138) and are ripe for review. After careful consideration, and for the reasons outlined below, Defendants Steven Mezrano ("Mezrano") and Mezrano Law Firm's ("MLF") (collectively, "Defendants") Motion (Doc. # 105) is due to be granted. In light of that ruling, Plaintiff Jennifer Whitworth's ("Plaintiff") Motion (Doc. # 107) is due to be denied as moot.

## I.     BACKGROUND

The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of Plaintiff, the non-moving party on Defendants' Motion (Doc. # 105). *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

Plaintiff signed an independent contractor agreement with MLF on July 22, 2016 and began work on August 1, 2016. (Doc. # 98-5 at 19). Plaintiff agreed to a guaranteed salary of $55,000 for her first two years, and 20% of all fees collected on cases assigned to her once she met the $55,000 draw. (Doc. # 98-1 at 70). Soon after she began working at MLF, Mezrano increased her fee percentage to 25%. (*Id*.). Plaintiff identifies two male attorneys at MLF -- Stewart Springer and Bruce Romeo -- who she claims are comparators who earned more than she did. (Doc. # 98-5 at 127). However, Mezrano testified that, despite a higher fee percentage Springer negotiated at the outset of his employment, Springer still earned less than Plaintiff, Adams, and Romeo. (Doc. # 98-1 at 90). Throughout Plaintiff's employment tenure with MLF, Defendants exercised control over her hours (Doc. # 98-5 at 51), her income structure (Doc. # 98-1 at 70), and the manner in which she interacted with clients (Doc. # 98-5 at 38).

Early in her employment, presumably in Fall 2016, Plaintiff, Mezrano, and a male attorney, Chris Long, were in a car together. (*Id*. at 77-78). Plaintiff mentioned that she had a mouse in her house. (*Id*.) Mezrano, who was driving, then referred to Plaintiff as a "dirty girl" and suggested that she was dirty "in more ways than one." (*Id*. at 77). Plaintiff responded by refocusing the conversation on her mouse problem. (*Id*.).

A few weeks later, during a break in a mediation conducted by mediator Brad Wash, Mezrano recounted a sexual episode in graphic detail in front of Plaintiff and their two clients. (*Id*. at 84-85). Mezrano told of a college friend of his who ejaculated on his girlfriend's stomach at a party. (*Id*.). Plaintiff does not recall what prompted Mezrano to tell such a story in a professional setting in front of a subordinate and two clients. (*Id*.). Plaintiff responded to Mezrano's story by looking down and keeping her head down for a little while -- she did not look back up to gauge the clients' reaction. (*Id*.).

2

Later in 2016 or perhaps early 2017, Plaintiff overheard Mezrano and MLF employee Stewart Springer mocking a client with no teeth, joking that the client (who was not present) "probably gave a good blow job." (*Id*. at 70). Plaintiff concedes that she was not a party to the conversation. (*Id*.). Further, when asked whether it was true that the two attorneys were recounting a story that the client in question had told them, Plaintiff was "not sure." (*Id*.). Regardless, Plaintiff was "very shocked" because the conversation was "inappropriate for the workplace." (*Id*.).

In 2017, while Plaintiff fixed breakfast in the breakroom, Mezrano looked her up and down and told her that she looked good in the dress that she was wearing and that he needed to buy his wife the same dress. (*Id*. at 88). Plaintiff testified that Mezrano then told her, "we can't all be as tall and beautiful as you." (*Id*.). Later, in Fall 2017, as Plaintiff and Mezrano rode in the car together, Mezrano again began "recounting some college days, specifically women that he slept with in college." (*Id*. at 68). One of the women to whom he referred as a "fuck buddy" was a client of the firm known to Plaintiff. (*Id*.).

Also in fall 2017, as Mezrano and Plaintiff approached the front door, Mezrano told Plaintiff that there is a rumor "going around at Shunarrah" that Mezrano and Plaintiff were having an affair. (*Id*. at 99). That same year, Mezrano approached Plaintiff as she sat at her desk and, tapping on his cheek, asked Plaintiff to give him a kiss. (*Id*. at 71-72). She refused and, at some point thereafter, he left her office. (*Id*.). Then, in December 2017, on the courthouse steps after winning a motion hearing, Mezrano put his arm around Plaintiff and pulled her close to him before telling her that she owes him. (*Id*. at 74).

Prior to August 2017, MLF employees were to report any concerns or complaints to female attorney Erin Adams or Mezrano. (Doc. # 98-1 at 163). In August 2017, however, MLF

hired Dawn Carre as its Firm Administrator. (*Id*. at 44). Employees were told at firm meetings that "if they had an issue or concern, they were to bring it to Dawn [and] they were to go to Dawn Carre with any complaint." (*Id*. at 42). Nevertheless, employees were reminded about the poster identifying their rights in the workplace in the breakroom and they should "*go speak to who [they] feel comfortable speaking to*." (*Id*. at 45) (emphasis added).

In 2017, Mezrano brought his infant daughter into Plaintiff's office. (*Id*. at 68). While Plaintiff was playing with the child, Mezrano said "I know … [s]he looks like Mommy, doesn't she?" (*Id*.). While Plaintiff concedes that she shares certain physical traits with Mezrano's wife, she found the comment offensive because she perceived the comment as though Mezrano was "imagining [Plaintiff] in [his wife's] stead." (*Id*.).

At some point between March 2017 and May 2018, Plaintiff walked a client to the building lobby after meeting with her. (*Id*. at 108). After the client exited the building, Mezrano walked in and told Plaintiff that he had just spoken with the client in the parking lot and that the client had remarked that Plaintiff and Mezrano "would make pretty babies together." (*Id*.). Plaintiff suspected that Mezrano was lying because she had heard him "use that line before, make pretty babies together." (*Id*. at 109).

In early 2018, while at a charity event, Mezrano pulled Plaintiff close to him for a photograph. (*Id*. at 75). Plaintiff compared the incident to the 2017 hug on the courthouse steps, describing the way he looked down at her and the way his eyes were on her as "creepy". (*Id*. at 76). Plaintiff tried to create distance by edging away from his embrace. (*Id*.). She did so before the photograph was taken, but nonetheless was made to feel uncomfortable. (*Id*.).

In February 2018, Mezrano began developing a plan to restructure the firm into "litigation" and "non-litigation" departments. (Doc. # 98-1 at 91). On March 15, 2018, Mezrano

4

announced the firm restructuring during a firm lunch at Jim 'N Nicks. (Doc. # 98-5 at 45). At this lunch, Plaintiff was "instructed that [she] would be primarily non-lit[igation] but [she would] keep [her] top ten litigation cases." (*Id*. at 44). Plaintiff did not contest her transfer to the new non-litigation department as long as she could continue litigating those cases. (*Id*.). In fact, Plaintiff was "somewhat relieved" to be assigned to the non-litigation group because she was feeling overwhelmed with her case load. (*Id*. at 48). Still, Plaintiff maintained that she did not want to abandon litigation entirely, and she insisted on maintaining a few litigation cases - as Mezrano indicated she could. (*Id*. at 47-48). Ultimately, attorneys Mary Bruce and Bruce Romeo comprised the litigation department, while Plaintiff and Erin Adams made up the non-litigation department. (Doc. # 98-7 at 18).

Sometime between February and April 2018, while Mezrano and Plaintiff were on a phone call discussing preparation for a trip they would be taking for the deposition of a plaintiff in one of their cases, Mezrano stated that they should get one hotel room and that he would not tell anybody if she did not. (Doc. # 98-5 at 60). In response, Plaintiff made clear that she would pay for her own flight and accommodations if that were an issue. (*Id*.). Mezrano then clarified that he was "just kidding" when he suggested they share a room. (*Id*.). Plaintiff was upset by Mezrano's proposition and cried after she hung up the call. (*Id*. at 62). Indeed, she grew so fearful that Mezrano would "attempt to have sex with her on this trip" that she asked her paralegal to join her to avoid being alone with Mezrano. (*Id*. at 66).

On May 1, 2018, shortly after Mezrano's statements about sharing a hotel room, Plaintiff reported Mezrano's proposition to Adams. (Doc. # 98-5 at 59-60). She further told Adams that she was concerned about being subjected to a sexual advance or retaliated against if she rejected an advance from Mezrano or otherwise confronted him. (*Id*. at 65-66). Plaintiff asked Adams not

to tell Mezrano about her complaints, and Adams agreed. (*Id.*). Despite this agreement, Plaintiff testified that she believes Adams told Mezrano about her complaint because Mezrano "never sexually harassed [her] not one more time after [she] reported it." (*Id.* at 104). Indeed, there were "no additional forms of sexual harassment of any kind" directed by Mezrano to Plaintiff after May 1, 2018. (*Id.*). Notwithstanding Plaintiff's belief to the contrary, Mezrano denies being aware of Plaintiff's complaint, and Adams denies that she told Mezrano of the complaint. (Docs. # 104-3 ¶ 24; 98-3 at 24-25). In fact, Adams denies that Plaintiff even discussed Mezrano's inappropriate behavior with her. (*Id.*).

In May 2018, pending cases at MLF were reassigned so that those in the litigation department handled all litigation cases and those in non-litigation handled all non-litigation cases. (Doc. # 104-2 at 72).[1] Because Plaintiff was handling more litigation cases than Adams before the restructure, she transferred more cases to the litigation department than did Adams. (Doc. # 104-3 ¶ 20). After the restructure, "new non-litigation intake matters were assigned to [] Whitworth and [] Adams on a rotating one-for-one assignment, with the exception of companion cases, referrals to a specific attorney, and repeat clients [previously represented by] a specific attorney." (*Id.* ¶ 23).

Immediately following the firm's restructure, a lull in advertising led to a lighter caseload across all attorneys and departments at MLF. (Doc. # 104-3 ¶ 22). Still, Plaintiff maintained the second largest caseload at the firm. (*Id.*). Plaintiff also made approximately $12,000 more in income after the restructure than she did in the first half of that year, and she made nearly $30,000 more in income in the first three months of 2019 than she did in the first three months of

---

[1] While Mezrano stated that cases were taken away from everybody at the firm, Whitworth testified that she thought Adams kept some litigation cases after the reassignment. She conceded, however, that this was just her unsupported recollection. (Doc. # 98-5 at 44).

2017 or 2018. (*Id.*). Plaintiff attributes her augmented income in 2019 to a case that she settled for approximately $200,000 and received 50% of the contingent attorney fee. (Doc. # 121-1 ¶ 110).

Once Plaintiff's litigation cases were reassigned to other attorneys, complaints arose about her work product. For example, Romeo testified that discovery had not been saved in the proper case files, although Plaintiff asserts that task was not her responsibility. (Docs. # 98-7 at 31; 130 ¶ 56(a)). Romeo also complained that Plaintiff had failed to perform certain elementary tasks, such as interviewing or deposing previously identified witnesses. (Doc. # 99-26). Mezrano testified that, at least once, Plaintiff failed to timely file a worker's compensation claim for a client. (Doc. # 104-2 at 67). Mezrano also received complaints from Plaintiff's staff that she would frequently ignore client communications. (Doc. # 98-1 at 75).

In November 2018, Plaintiff states that she was excluded from a firm commercial being filmed at the courthouse. (Doc. # 121-1 ¶¶ 62-64). Once the commercial aired, Mezrano hosted a commercial viewing session for all MLF staff and employees, but Plaintiff was excluded. (*Id.* ¶ 65).

In or around March 2019, a bankruptcy trustee purportedly discovered that, in March 2018, Plaintiff negotiated a settlement on a client's behalf without notifying the client's bankruptcy trustee, despite receiving notice of the client's bankruptcy proceedings in February of that year. (Docs. # 104-3 ¶ 33; 98-5 at 116-17). Plaintiff falsely represented that she was unaware of the bankruptcy to the trustee. (Doc. # 104-1 at 4). The trustee expressed his frustrations to Mezrano, who then exclaimed to Plaintiff's staff that the trustee "hated" the firm. (Docs. # 104-2 at 106-07; 98-5 at 115).

On March 27, 2019, Plaintiff entered a prescheduled meeting after telling Ingram that she planned to confront Mezrano for his comments to her staff. (Doc. # 98-6 at 51). In the course of that confrontation, Plaintiff began yelling at Mezrano and refused to return to her office as Mezrano instructed. (Doc. # 98-5 at 124). The encounter escalated as the parties began yelling about the bankruptcy matter and Mezrano's conduct towards Plaintiff's staff. (*Id.*). Mezrano eventually told Plaintiff that she was dismissed. (*Id.*).

On April 15, 2019, after leaving MLF, Plaintiff went to work with Vernis & Bowling. (Doc. # 121-1 ¶ 143). Soon thereafter, Mezrano unsuccessfully moved to disqualify her from representing a client on the grounds that, because Mezrano represented the other party in the suit, Plaintiff had a conflict of interest. (*Id.* ¶ 144).

On May 1, 2019, Plaintiff sent Defendants a preservation of evidence letter stating that she was subjected to sexual harassment and retaliation. (Doc. # 64-2 at 26-36). The following day, Defendants also sent Plaintiff's counsel a preservation letter. (*Id.* at 37-38). On June 24, 2019, the EEOC received Plaintiff's Charge of Discrimination. (Doc. # 10-1). In her Charge, Plaintiff alleged sex discrimination and retaliation. (*Id.* at 2). On January 17, 2020, the EEOC issued Plaintiff a Dismissal and Notice of Right to Sue. (Doc. # 117-10 at 2). On April 14, 2020, the parties executed a tolling agreement, which was set to expire on May 31, 2020. (*Id.*).

On May 29, 2020, Plaintiff brought this action against Defendants alleging (1) Title VII sex discrimination, harassment, and retaliation; (2) Title VII hostile work environment; (3) violations of the Equal Pay Act ("EPA"); (4) invasion of privacy; (5) negligent hiring, training, supervision, and retention; and (6) intentional infliction of emotional distress. (Doc. # 1). Plaintiff amended her complaint on July 7, 2020. (Doc. # 10). Defendants filed a Motion to Dismiss (Doc. # 32), which the court granted in part, dismissing Plaintiff's claims of intentional

8

infliction of emotional distress and negligent hiring and retention. (Doc. # 35). Plaintiff's claims that are still at issue in this action allege the following violations: (1) Title VII sex discrimination, harassment, and retaliation; (2) Title VII hostile work environment; (3) the Equal Pay Act; (4) invasion of privacy; and (5) negligent training and supervision.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support each element essential to his case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## III.   Discussion

The court first addresses Defendants' Motion for Summary Judgment (Doc. # 105) because, if that Motion is due to be granted, Plaintiff's Partial Motion for Summary Judgment on Defendants' affirmative defenses would be moot. (Doc. # 107).

### A.     Defendants' Motion for Summary Judgment

In support of their Motion, Defendants advance the following arguments: (1) Plaintiff's Title VII and EPA claims fail because she was an independent contractor of MLF, not an employee; (2) Plaintiff's sex discrimination, sexual harassment, and retaliation claims cannot survive summary judgment because most of her claims are time barred and, in any event, she cannot establish a prima facie case under Title VII; (3) Plaintiff's pay discrimination claims are without merit because she was not similarly situated to her male comparators; (4) Plaintiff's invasion of privacy claim fails as a matter of law because portions of it are time barred and none of her allegations constitute intrusion upon seclusion or false light; (5) Plaintiff cannot establish negligent training and supervision against MLF because the torts underlying that claim are due to be dismissed; and (6) Even if her Title VII claims survived summary judgment, Plaintiff is not entitled to back pay because her damages would be cut off in April 2019 when Defendants learned that she engaged in terminable misconduct. (Doc. # 106). The court addresses these arguments in turn.

### 1.     Plaintiff was an Employee of MLF, Not an Independent Contractor

A Title VII claim "can only be brought by an employee against his employer." *Id*. (citing *Llampallas v. Mini-Circuits, Lab, Inc*., 163 F.3d 1236, 1242 (11th Cir. 1998)). Consistent with the intent and purposes of Title VII, "the federal courts have interpreted the term 'employer' liberally." *Id*. (citing *Virgo v. Riviera Beach Assocs.*, *Ltd.*, 30 F.3d 1350, 1359 (11th Cir. 1994)). In deciding whether an entity is a qualified employer, courts in this circuit have typically asked "who (or which entity) is in control of the fundamental aspects of the employment relationship that gave rise to the claim." *Id*. (quoting *Lyes v. City of Riviera Beach*, 177 F.3d 1332, 1345 (11th Cir. 1999) (en banc)). To answer this question, courts consider "(1) how much control the

alleged employer exerted on the employee, and (2) whether the alleged employer had the power to hire, fire, or modify the terms and conditions of the employee's employment." *Id*. (citing *Welch*, 57 F.3d at 1011; *Llampallas*, 163 F.3d at 1243).

In the Eleventh Circuit, whether an individual is an employee or independent contractor is a legal question for a court to decide. *See Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 339 (11th Cir. 1982) ("This Court has held that employee status under Title VII is a question of federal law…"); *Patel v. Wargo*, 803 F.2d 632, 634 (11th Cir. 1986) ("Whether [defendants] were employers within the meaning of the [FLSA] is a legal determination."); *Diego v. Victory Lab, Inc.*, 282 F. Supp. 3d 1275, 1280 (S.D. Fla. 2017) ("The question of whether an individual is an employee or independent contractor is a legal question, with the subsidiary findings being issues of fact.").

Generally, "an employee's status is determined by examining the language contained in Title VII, existing federal case law, and the circumstances of the case." *Peppers v. Cobb Cty., Ga.*, 835 F.3d 1289, 1296 (11th Cir. 2016) (citing *Calderon v. Martin Cty.*, 639 F.2d 271, 273 (5th Cir. 1981)). Likewise, when determining whether an employer is subject to the terms of the EPA, courts consider "three basic factors: whether the employment took place on the alleged employer's premises; the degree of control the putative employer exerted over the employee[]; and whether the alleged employer had the power to fire, hire, or modify the terms … of employment." *Id*. (citing *Welch v. Laney*, 57 F.3d 1004, 1011 (11th Cir. 1995)).

Here, despite the Parties' "independent contractor agreement," Plaintiff was an employee of MLF for Title VII and EPA purposes. Among the "fundamental aspects of the employment relationship that gave rise to the claim" are Plaintiff's pay, the nature of the cases she would handle, and her workload. (Doc. # 10 at 13-17). MLF unquestionably exerted substantial control

over Plaintiff, setting her hours (Doc. # 98-5 at 51), structuring her income (Doc. # 98-1 at 70), even instructing Plaintiff how and when to communicate with firm clients (Doc. # 98-5 at 38). And, of course, MLF had the power to hire, fire, or modify the terms and conditions of the employment because MLF *actually* hired Plaintiff, fired her, and modified the terms and conditions of her employment. Thus, because Plaintiff's relationship with MLF more closely resembled that of an employee than of an independent contractor, she is entitled to protection under Title VII and the EPA.

### 2.   Plaintiff's Gender Discrimination Claim in Count One [2]

"Discrimination claims brought under Title VII … are typically categorized as either mixed-motive or single-motive claims." *Quigg v. Thomas Sch. Dist.*, 814 F.3d 1227, 1232 (11th Cir. 2016). Single-motive and mixed-motive discrimination claims can be established with either direct or circumstantial evidence. *Id.* (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-102 (2003)). Under the mixed-motive framework,

> to survive a defendant's motion for summary judgment, a ... plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was a motivating factor for the defendant's adverse employment action.

*Id.* at 1232-33 (citing *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008)). While this Circuit has historically used the *McDonnell-Douglas* framework to evaluate circumstantial evidence-based discrimination claims at summary judgment, the court in *Quigg* noted that "[t]his framework is fatally inconsistent with the mixed-motive theory of

---

[2] The Eleventh Circuit has engaged in "a thirty-year salvo of criticism aimed at shotgun pleadings." *Weiland v. Palm Beach Cty. Sheriff's Off.*, 792 F.3d 1313, 1321 (11th Cir. 2015). Plaintiff's Amended Complaint is the type where each cause of action or claim for relief is not separated into a different count. *Id.* By asserting three claims in one count and realleging the majority of facts in every count, Plaintiff places an unnecessary burden on the court and opposing parties. Pleading in this manner requires them to parse the entirety of the pleading to determine precisely what is being alleged. The Amended Complaint likely was defective on this basis alone.

discrimination because the framework is predicated on proof of a single, 'true reason' for an adverse action." *Id*. at 1237. Accordingly, "[i]n light of this clear incongruity between the *McDonnell-Douglas* framework and mixed-motive claims, it is improper to use that framework to evaluate such claims at summary judgment." *Id*. at 1238.

Here, Plaintiff asserts that her sex was "a motivating factor in [MLF]'s decision to subject [her] to adverse employment actions including differing terms of employment, pay raises, and equal pay to that of her male coworkers." (Doc. # 10 ¶ 85). Because she alleges that her sex was only *a* motivating factor in her treatment, the court analyzes her claim under *Quigg*'s mixed-motive framework. Under that framework, the Rule 56 record does not raise any inference that her sex was a motivating factor in those actions.

First, Plaintiff suggests that her sex was a motivating factor in "Defendants' decision[] to reassign her to the non-litigation department." (Doc. # 130 at 41). However, Plaintiff fails to explain how her reassignment to the non-litigation department was an adverse action. Plaintiff's case load lightened, and she earned significantly more in the early part of her tenure in non-litigation than she had in her time in the litigation department. (Doc. # 104-3 ¶ 22). Plaintiff herself testified that non-litigation employees can earn more than litigation employees, and that the role is no less prestigious. (Doc. # 98-5 at 14).

Further, even if Plaintiff's reassignment did constitute an actionable adverse employment action, Plaintiff has presented *no* evidence that her sex was a motivating factor in Defendants' decision to reassign her. (*See* Doc. # 130 at 41-43). Most of Plaintiff's support for her claim consists of actions Defendants took against other female attorneys: Mary Bruce and Mary Ingram. (Doc. # 130 at 41-42). These actions include closely monitoring Bruce's whereabouts during work hours, assigning Bruce (a female who remained in the litigation department) less

lucrative cases, and generally not valuing the work done by Bruce and Plaintiff. (*Id*.). While these actions might indicate favoritism or resentment, the Rule 56 record does not contain substantial evidence that sex motivated the particular decision at issue; therefore, the summary judgment record does not support Plaintiff's claim that her reassignment constituted gender discrimination. *See Succar v. Dade Cty. Sch. Bd*., 229 F.3d 1343, 1345 (11th Cir. 2015) (holding that "[p]ersonal animosity is not the equivalent of sex discrimination.... The plaintiff cannot turn a personal feud into a sex discrimination case....") (internal quotations omitted)). Because the record evidence does not suggest either that the reassignment was an adverse employment action <u>or</u> that her sex was a motivating factor behind the reassignment, summary judgment is due to be granted on Plaintiff's Title VII gender discrimination claim.

### 3.      Plaintiff's Title VII Sexual Harassment Claim in Count One

Defendants argue that Plaintiff's sexual harassment claims are time barred, and that even if not time barred, Plaintiff "cannot establish that she was subjected to actionable sexual harassment." (Doc. # 106 at 25). Because Plaintiff's sexual harassment claim is clearly untimely, the court need not address whether the conduct rose to an actionable level.

"Under § 706 of Title VII, 42 U.S.C. § 2000e-5(e)(1), only those 'unlawful employment practice[s]' that are complained of in a timely-filed charge of discrimination to the EEOC can form the basis for Title VII liability." *Ledbetter v. Goodyear Tire & Rubber Co*., 421 F.3d 1169, 1178 (11th Cir. 2005). "For claims arising in so-called 'non-deferral' states, such as Alabama, to be timely, the applicable charge must have been filed within 180 days 'after the alleged unlawful employment practice occurred.'" *Id*. (quoting 42 U.S.C. § 2000e-5(e)(1)). When considering whether a Plaintiff's Title VII hostile environment claim is timely, "it is irrelevant that some of the acts making up the claim occurred outside the statutory time period; if at least one act

contributing to the claim occurred within the filing period, all of the acts may be considered for purposes of determining liability." *Faircloth v. Herkel Investments Inc.*, 514 F. App'x 848, 850 (11th Cir. 2013) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)).

Here, Plaintiff's sexual harassment claim is plainly time barred. Plaintiff testified that the final discrete instance of what she contends was sexual harassment occurred before May 1, 2018—over a year before she filed her EEOC charge in June 2019. (Doc. # 98-5 at 104); (Doc. # 10-1). Consequently, because Mezrano did not engage in *any* acts of sexual harassment within the statutory time period, her Title VII harassment claim is time barred. This conclusion applies equally to Plaintiff's sexual harassment claims in Count One of her Amended Complaint (Doc. # 10 at 22-24) and her hostile work environment claim in Count Two (*id.* at 25-27). Even under the continuing violation doctrine outlined in *Morgan* and *Faircloth*, Plaintiff's sexual harassment claims are untimely because none of the alleged instances of harassment occurred within the 180-day statutory time period. 536 U.S. at 115-18. Therefore, Defendants are entitled to summary judgment on Plaintiff's Title VII sexual harassment claims.

### 4.      Plaintiff's Title VII Retaliation Claim in Count One

To succeed on a Title VII retaliation claim, Plaintiff "must first make out a prima facie case of retaliation, showing (1) that she engaged in statutorily protected activity, (2) that she suffered an adverse action, and (3) that the adverse action was causally related to the protected activity." *Patterson v. Ga. Pacific, LLC*, 38 F.4th 1336, 1344-45 (11th Cir 2022) (citing *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020)). If the plaintiff can make that showing, "the burden shifts to the employer to articulate a legitimate, non-discriminatory reason or reasons for the [alleged] retaliation." *Patterson*, 38 F.4th at 1345. "If the employer

does, the plaintiff must show that each reason is merely a pretext and that the real reason was retaliation." *Id*.

"An employee's complaint about discrimination constitutes protected activity if the employee could 'reasonably form a good faith belief that the alleged discrimination existed.'" *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018) (quoting *Taylor v. Runyon*, 175 F.3d 861, 869 (11th Cir. 1999)). "Termination is a materially adverse action." *Id*. Often, the key question in assessing a retaliation claim under Rule 56 involves an examination of the causal relation element of a plaintiff's prima facie case. With respect to causation, the Eleventh Circuit "construe[s] the causal link element broadly so that 'a plaintiff merely has to prove that the protected activity and the adverse action are not completely unrelated.'" *Muggleton v. Univar USA, Inc.*, 249 F. App'x 160, 163 (11th Cir. 2007) (quoting *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004)).

Here, Plaintiff claims that Defendants retaliated against her by (1) restructuring the firm, placing her in the non-litigation department, and giving her lower value cases (Doc. # 10 ¶ 95); (2) terminating her employment (*id*. ¶ 94); and (3) attempting to have her and her current law firm "disqualified from representing a client due to an alleged conflict of interest (*id*. ¶ 97). Defendants argue that they are entitled to summary judgment on Plaintiff's Title VII retaliation claim for several reasons.

First, Defendants argue that certain discrete acts of retaliation alleged by Plaintiff are time barred. (Doc. # 106 at 30-31). "Discrete acts such as termination … are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Morgan*, 536 U.S. at 115. This means that "only incidents that took place within the timely filing period are actionable." *Id*. The firm

17

restructuring took place in March 2018 (Doc. # 98-5 at 45). Plaintiff did not file her EEOC charge until June 2019. (Doc. # 10-1) Therefore, a retaliation claim regarding the restructuring is untimely.[3] Plaintiff also testified that Defendants' exclusion of her from the filming of a firm commercial was retaliatory. (Doc. # 121-1 ¶¶ 62-64). However, any claim regarding this incident is also time barred because it occurred more than 180 days before she filed her EEOC charge. (Doc. # 10-1). These are the only discrete acts of alleged retaliation that are time barred. Defendants do not dispute the timeliness of the remaining alleged instances of retaliation.

Second, Defendants contend that Plaintiff's retaliation claim fails as a matter of law because she "cannot show Mezrano … had knowledge she engaged in protected activity under Title VII prior to any alleged adverse action." (Doc. # 106 at 31-32). In this Circuit, a plaintiff must show "that the decisionmaker actually knew about the employee's protected expression." *Martin v. Fin. Asset Mgmt. Sys., Inc*., 959 F.3d 1048, 1053 (11th Cir. 2020) (citing *Brungart v. BellSouth Telecomm., Inc*., 231 F.3d 791, 799 (11th Cir. 2000)). "That awareness, like most issues of fact, can be established through circumstantial evidence—but not by unsupported inference." *Id*. Put differently, "a jury finding that a decisionmaker was aware of an employee's protected conduct 'must be supported by reasonable inferences from the evidence [here, the Rule 56 evidence], not mere speculation.'" *Id*. (quoting *Clover v. Total Sys. Serv., Inc*., 176 F.3d 1346, 1355 (11th Cir. 1999)).

A careful review of the summary judgment record shows that Plaintiff has presented only "mere speculation" that Mezrano was aware of her complaint to Adams. Indeed, Plaintiff's only

---

[3] Defendants also contend that the MLF restructure and Plaintiff's case reassignments could not have been retaliatory because the restructure was planned even before Plaintiff complained to Adams. (Doc. # 104-3 ¶ 10). This argument fails because although the evidence shows that the restructure was planned before Plaintiff made her complaint, the cases were not reassigned until May 2018, which was after Plaintiff's complaint was made. Nevertheless, and in any event, Plaintiff cannot establish a retaliation claim regarding the restructuring because the claim is quite clearly untimely.

evidence of Mezrano's awareness is that his harassing behavior stopped. In *Martin*, the court held that a plaintiff's suspicion that the HR manager had informed her boss of her complaints was insufficient to survive summary judgment when her boss testified that he had no idea she had complained and the HR manager corroborated the boss's testimony by denying that she ever informed the boss of the plaintiff's complaint. 959 F.3d at 1053. Similarly, here, Mezrano denies being aware that Plaintiff complained to Adams (Doc. # 104-3 ¶ 24) and Adams denies telling Mezrano anything about Plaintiff's alleged complaints about him. (Doc. # 98-3 at 24-25).[4] On this record, Plaintiff cannot show Defendants' awareness of her complaint, which is required for her to establish a causal connection between her complaint and any action by Defendants.

Third, Defendants maintain that Plaintiff cannot make even a basic showing that her termination was retaliatory. (Doc. # 106 at 34-35). Plaintiff responds that she can make such a showing because she "was only terminated after her complaints of gender discrimination" were made. (Doc. # 10 ¶ 94). The court interprets this argument as mounting an attack on the "tempor proximity" -- *i.e.*, that Plaintiff's evidence as to why the termination was retaliatory is limited to the timing of the adverse action in relation to her purported protected activity. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Id.* (citing *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248,

---

[4] Adams also denies that she had any conversation with Plaintiff about Mezrano acting inappropriately towards Plaintiff. (*Id.*). At first blush, it may appear that dispute itself creates a genuine issue of material fact. But it does not. Even assuming that the trier of fact drew an inference from this dispute over whether Plaintiff and Adams discussed Mezrano's inappropriate behavior and concluded that Adams was also lying about not having discussed Plaintiff's complaints with Mezrano, Plaintiff cannot show a causal connection between her complaints and her termination for additional reasons that are discussed below.

1253 (10th Cir. 2001)); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (3-month

period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (4-month

period insufficient).

Here, even if Plaintiff could show that Defendants were aware of her protected activity

(which she cannot), her claim still fails because she cannot establish a causal connection between

that protected activity and her termination based on the timing of the two events or otherwise.

Plaintiff was terminated on March 17, 2019, over ten months after her May 1, 2018, conversation

with Adams. (Doc. # 98-5 at 104, 124-25). As the cases cited above indicate, such a lengthy time

period between protected activity and termination is plainly insufficient to support the causation

element of a retaliatory termination claim.

Moreover, even if Plaintiff could establish a prima facie case that her termination was

retaliatory (and again, she cannot), Defendants contend that  their articulated reason for

discharging her -- her insubordinate behavior, yelling at Mezrano, and refusing to leave his office

-- provided them with a legitimate, non-retaliatory reason to terminate her. (*See id*. at 124-25);

*Patterson*, 38 F.4th at 1345; *see also Entrekin v. City of Panama City*, 376 F. App'x 987, 997-98

(11th Cir. 2010) (holding that documented examples of insubordination constitute legitimate,

non-discriminatory, and non-pretextual reasons for termination). The undisputed Rule 56

evidence shows that Plaintiff's termination occurred as a result of a confrontation over the issue

involving the bankruptcy trustee. Plaintiff ignored Mezrano's repeated instructions to return to

her office and instead continued yelling at him in her own defense. (Doc. # 98-5 at 124).

Defendants have met their burden "to articulate a legitimate, non-discriminatory reason for the

retaliation"; so, Plaintiff "must show that [the articulated] reason is merely a pretext." *Patterson*,

38 F.4th at 1345. Here, Plaintiff has not presented any Rule 56 evidence indicating that

Defendants' stated reasons for terminating her were pretextual, much less a pretext for a retaliatory motive.

Finally, Defendants assert that "none of [Plaintiff]'s other alleged retaliatory acts amount to materially adverse actions under Title VII." (Doc. # 106 at 35). The only remaining alleged basis for Plaintiff's retaliation claim is Defendants' attempt to disqualify Plaintiff's new law firm "from representing a client due to an alleged conflict of interest." (Doc. # 10 ¶ 97). To be sure, former employees fall within Title VII's protection against retaliation. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 345-46 (1997). However, Plaintiff cannot establish a Title VII retaliation claim on the basis of Defendants' attempt to disqualify her and her subsequent law firm. Even if Plaintiff could establish a prima facie case of retaliation on this issue, which she cannot given the lengthy time period between the alleged protected activity and the motion to disqualify, she does not even argue that Defendants' reason for seeking disqualification -- a client conflict -- was a pretext for a retaliatory motive. *See Patterson*, 38 F.4th at 1345. Because Plaintiff fails to offer any sort of argument regarding pretext, the attempted disqualification cannot support a Title VII retaliation claim.

Because Plaintiff cannot establish a retaliation claim regarding any of the alleged adverse employment actions, Defendants are entitled to summary judgment on the retaliation claim in Count One of Plaintiff's Amended Complaint.

### 5.    Plaintiff's Hostile Work Environment Claim in Count Two

Count Two of Plaintiff's Amended Complaint purports to assert a separate hostile work environment claim, but it is predicated on the same conduct as her harassment claim in Count One. (Doc. # 10 at 25-27). As discussed above, Plaintiff's sexual harassment claim is time barred because she acknowledges the last instance of what she claims is sexual harassment occurred

over a year before she filed her EEOC charge. (Docs. # 98-5 at 104; 10-1). However, in her opposition to Defendants' motion for summary judgment, Plaintiff argues -- for the first time -- that her hostile work environment claim is not, as alleged in her Amended Complaint, predicated only on sexual harassment. (Doc. # 130 at 27-28). Rather, she contends that four distinct subcategories of conduct created a hostile environment: sexual harassment, intimidation, hostility towards women, and sexual stereotypes that "combine to create a single hostile environment." (*Id.* at 27). Plaintiff argues that this conduct ultimately led to her termination and that it also supports a retaliatory hostile environment claim. (*Id.*).

Plaintiff's attempt to sidestep the timeliness requirement is unpersuasive. In the Eleventh Circuit, a non-moving party plaintiff may not "raise a new legal claim for the first time in response to the opposing party's summary judgment motion." *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1313 (11th Cir. 2004). In her Amended Complaint, Plaintiff's only hostile work environment claim is based on sexual harassment. (Doc. # 10 at 25-27). As Plaintiff herself has acknowledged, "[t]he standard for a [retaliatory] hostile work environment is different than for a hostile work environment based on sex." (Doc. # 130 n. 11) (citing *Jones v. Birmingham*, No. 21-12962, 2022 WL 4393344 (11th Cir. Sept. 23, 2022)). And, as the court in *Jones* held, "[t]here are two types of hostile work environment claims under Title VII: one based on discrimination, and the other based on retaliation." *Jones*, 2022 WL 4393344, at *4 (citing *Babb v. Sec'y, Dep't of Veteran's Affs.*, 992 F.3d 1193, 1206-07 (11th Cir. 2021)). Plaintiff has only asserted a hostile work environment claim based on sexual harassment. Sexual harassment hostile work environment claims and retaliatory hostile work environment claims are separate and distinct, and must be pleaded, argued, and supported separately.

22

The court must reject Plaintiff's belated assertion of a retaliatory hostile environment, raised for the first time in her opposition to Defendants' motion for summary judgment. As the Eleventh Circuit made clear in *Gilmour*, the court cannot consider new claims raised for the first time at this juncture. 382 F.3d at 1313. If Plaintiff had wished to introduce a new type of hostile work environment claim, the proper avenue would have been to amend her pleadings to add that claim. Because she failed to do so, the court considers only those claims asserted in her Amended Complaint. As already noted, Plaintiff's hostile work environment claim based on sexual harassment is time barred. It is simply too late for her to assert a hostile environment claim based upon retaliation now. Therefore, Defendants are entitled to summary judgment on Count Two of Plaintiff's Complaint.

### 6.        Plaintiff's Equal Pay Act in Count Three

Plaintiff has conceded that her separate wage-related claims "would not survive summary judgment." (Doc. # 130 at 43 n. 50). This concession makes sense because she cannot establish a prima facie case of wage discrimination under either the EPA or Title VII because (1) she has not identified a male comparator who was paid more and whose work was substantially similar to hers after the firm restructure and, as discussed above, and (2) she has not presented substantial evidence of an intent to discriminate based on sex in the area of pay. Therefore, Defendants are entitled to summary judgment on Count Three of Plaintiff's Amended Complaint.[5]

---

[5] The court commends Plaintiff for making this concession.

**7.     The Court Declines to Exercise Jurisdiction over Plaintiff's State Law Claims**

In addition to Plaintiff's federal claims under Title VII and the EPA, she has alleged state law claims of invasion of privacy (Doc. # 10 at 29-31) and negligent training and supervision (*id.* at 31-32) under Alabama law. It is well settled in this Circuit that "state courts, not federal courts, should be the final arbiters of state law." *Ingram v. School Bd. of Miami-Dade Cty.*, 167 F. App'x 107, 108 (11th Cir. 2006) (quoting *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997)). Indeed, "there is a very strong argument for dismissal [of state law claims], especially where the federal claims are dismissed prior to trial." *Id.* (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).

"In fact, 'if the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of state claims.'" *Id.* at 108-09 (quoting *Mergens v. Dreyfoos*, 166 F.3d 1114, 1119 (11th Cir. 1999)). Therefore, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court <u>should</u> decline the exercise of jurisdiction by dismissing the case without prejudice." *Eubanks v. Gerwen*, 40 F.3d 1157, 1161-62 (11th Cir. 1994) (emphasis added) (holding that federal claims dismissed at the summary judgment stage have been "disposed of rather early on") (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

Here, because Defendant is entitled to summary judgment on Plaintiff's federal claims, and because Plaintiff has not alleged any independent basis for subject matter jurisdiction over her state law claims, the court declines to exercise jurisdiction over those claims.

### B. Plaintiff's Motion for Summary Judgment

Because Defendants are entitled to summary judgment on the federal claims in Counts One, Two, and Three, and because the court declines to exercise jurisdiction over the remaining state law claims, Plaintiff's Motion for Summary Judgment directed at Defendants' affirmative defenses is moot. *See Auburn Univ. v. Int'l Bus. Mach. Corp.*, No. 09-cv-694, 2012 WL 3151545, at *17 (M.D. Ala. Aug. 2, 2012) (denying as moot a plaintiff's summary judgment motion on a defendant's affirmative defense because the defendant's affirmative defenses were moot once summary judgment was granted in its favor).

## IV.   CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is due to be granted as to Counts One, Two, and Three of Plaintiff's Amended Complaint. Because neither party has provided an independent basis for jurisdiction over the remaining state law claims, the court declines to exercise jurisdiction over these claims. Finally, because Defendants are entitled to summary judgment, Plaintiff's motion for summary judgment on Defendants' affirmative defenses (Doc. # 107) is due to be denied as moot. A separate order will be entered.

**DONE** and **ORDERED** this March 13, 2023.

_____

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE